**ORIGINAL**

Approved: _____
CHRISTOPHER J. DIMASE
Assistant United States Attorney

Before:  HONORABLE ANDREW J. PECK
United States Magistrate Judge
Southern District of New York

14 MAG 2848

- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA

    - v. -

GIBRON LOPEZ,
    a/k/a "Gibbs,"
    a/k/a "G,"
LUIS GUERRERO,
    a/k/a "Weegi,"
JOSE RODRIGUEZ,
    "D.R.," and
JOSE ORTIZ,
    a/k/a "Chico,"

              Defendants.

- - - - - - - - - - - - - - - - - - X

COMPLAINT

Violations of 18 U.S.C. §§ 1951, 924(c), and 2; 21 U.S.C. § 846

COUNTY OF OFFENSE: BRONX

SOUTHERN DISTRICT OF NEW YORK, ss.:

    AMANDA SCHWEINER, being duly sworn, deposes and says that she is a Special Agent with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), and charges as follows:

COUNT ONE

    1.  From at least in or November 2014, up to and including on or about December 18, 2014, in the Southern District of New York and elsewhere, GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, and others known and unknown, unlawfully, and knowingly did combine, conspire, confederate, and agree together and with each other to commit robbery, as that term is defined in Title 18, United States Code, Section 1951(b)(1), and would and did thereby obstruct, delay, and affect commerce and the movement of articles and commodities in commerce, as that term is defined in Title 18, United States Code, Section 1951(b)(3), to wit, LOPEZ,

GUERRERO, RODRIGUEZ, and ORTIZ, and others known and unknown, agreed together to commit an armed robbery of a two persons suspected of possessing narcotics in ~~a vehicle in the Bronx,~~ Yonkers New York. (initialed)

(Title 18, United States Code, Section 1951.)

### COUNT TWO

2. On or about December 18, 2014, in the Southern District of New York, GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, during and in relation to a crime of violence for which they may be prosecuted in a court of the United States, namely, the robbery conspiracy charged in Count One of this Complaint, knowingly did use and carry firearms, and, in furtherance of such crime, did possess firearms, and did aid and abet the use, carrying, and possession of firearms.

(Title 18, United States Code, Sections 924(c)(1)(A)(i) and 2.)

### COUNT THREE

3. From at least in or about November 2014, up to and including on or about December 18, 2014, in the Southern District of New York and elsewhere, GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, and others known and unknown, intentionally and knowingly did combine, conspire, confederate, and agree together and with each other to violate the narcotics laws of the United States.

4. It was a part and an object of the conspiracy that GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, and others known and unknown, would and did distribute and possess with intent to distribute a controlled substance, in violation of Title 21, United States Code, Section 841(a)(1).

5. The controlled substance that GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, conspired to distribute and possess with the intent to distribute was five kilograms and more of mixtures and

substances containing a detectable amount of cocaine, in violation of Title 21, United States Code, Section 841(b)(1)(A).

(Title 21, United States Code, Section 846.)

## COUNT FOUR

6.  On or about December 18, 2014, in the Southern District of New York, JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, unlawfully and knowingly, after having been convicted in a court of crimes punishable by imprisonment for a term exceeding one year, did possess in and affecting commerce, firearms, to wit, a Keltec P-11 nine millimeter semi-automatic pistol and a Sentinel MK IV .22 caliber revolver, which had previously been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Section 922(g)(1))

The bases for my knowledge and for the foregoing charges are, in part, as follows:

7.  I am a Special Agent with the ATF assigned to the Special Pattern and Robbery Technical Assistance Task Force ("SPARTA"), and I am one of the case agents with primary responsibility for this investigation. During my employment with the ATF, I have participated in a number of investigations of armed robberies and home invasions. During the course of these investigations, I have conducted or participated in surveillance, the introduction of undercover agents, the execution of search warrants, and debriefings of informants. Through my training, education, and experience, I have become familiar with: (a) the manner in which robbers commit robberies, homicides, and other offenses; (b) the methods for robberies and other offenses; (c) the efforts of persons involved in such activity to avoid detection by law enforcement; and (d) the manner in which firearms are used in connection with criminal activity.

8.  This Affidavit is based upon my personal participation in the investigation, my examination of reports and records, and my conversations with other law enforcement agents and other individuals. Because this Affidavit is being submitted for the limited purpose of demonstrating probable cause, it does not include all the facts that I have learned during the course of my investigation. Where the contents of documents and the actions, statements, and conversations of

others are reported herein, they are reported in substance and in part, except where otherwise indicated.

9. Since in or about November 2014, SPARTA has been investigating a home invasion and armed robbery organization operating in the New York City area. SPARTA has been assisted in this investigation by a confidential source ("CS-1").[1] Information provided to date by CS-1 in this investigation has proven reliable, and has been corroborated by other independent means, such as agent surveillance and recorded conversations and meetings.

10. According to CS-1, on or about November 26, 2014 GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, contacted CS-1 looking for a target to commit a home invasion robbery. LOPEZ and CS-1 spoke on the phone regarding the possibility of planning a robbery together.

11. On or about December 5, 2014, at the direction of law enforcement, CS-1 met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, at a location in the Bronx, New York; the meeting was recorded and surveilled by agents.[2] Based on my review of a report prepared by the UC following his review of the audio recording, I learned the following, in sum and substance and in part: (a) CS-1 advised LOPEZ that he was going to contact his associate - actually an ATF undercover officer (the "UC") posing as a member of a drug trafficking organization - about setting up a robbery; (b) CS-1 then called the UC and engaged in a short conversation; (c) upon concluding the call, the CI advised LOPEZ that the UC was a drug courier with knowledge of a drug storage location (the "Stash House"), and that the UC was seeking half of the proceeds of any robbery; (d) LOPEZ questioned CS-1 as to how many individuals would be present at the Stash House, and CS-1 responded that CS-1 believed that only one person would be present; (e) LOPEZ questioned CS-1 regarding how many kilograms would be present in

---

[1] CS-1 is cooperating with law enforcement in this investigation in the hope of receiving consideration for potential federal criminal charges.

[2] The UC is familiar with LOPEZ's voice based on several meetings with LOPEZ, described in this Complaint. I am also familiar with LOPEZ's voice, based on my review of the audio recordings described in this Complaint and based on my conversations with the UC. In addition, I reviewed a video recording of LOPEZ speaking during the below-described meeting of December 10, 2014.

4

the Stash House, and CS-1 responded that CS-1 believed that there were three or four kilograms; (f) CS-1 arranged for the UC to meet with LOPEZ on or about December 8, 2014; and (g) CS-1 and LOPEZ discussed the number of individuals that would be needed to participate in the robbery.

12. On or about December 9, 2014, at the direction of law enforcement, CS-1 met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, at a location in Manhattan; the meeting was recorded and surveilled by agents. Based on my review of the audio recording, I learned the following, in sum and substance and in part: (a) CS-1 stated that CS-1 didn't want any mistakes, and LOPEZ responded "everyone has gotta go;" (b) LOPEZ asked CS-1 if CS-1 knew where LOPEZ could obtain a silencer, and further stated that LOPEZ had been asking around for a silencer because "a silencer will kill everything"; (c) LOPEZ stated that an individual known as "Weegi" would be assisting LOPEZ in the home invasion robbery; (d) LOPEZ stated that they weren't just going to go in and tie guys up, and that the guys in the Stash House would have to go; (e) LOPEZ stated that it was important to shave the stamp off of the kilograms after the robbery; (f) LOPEZ stated that he wanted to make sure that the UC could be trusted and was not going to sell them out; and (g) LOPEZ indicated that nothing about the robbery would be hard, stating that "getting through the door ain't hard, pressing the nigga ain't hard, the hardest thing is getting the fuck out."

13. During the same meeting in Manhattan on or about December 9, 2014, CS-1 also introduced GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, to the UC. Following the introduction, LOPEZ and the UC spoke to one another; the meeting was recorded and surveilled by agents. Based on my review of a report prepared by the UC following his review of the audio recording, I learned the following, in sum and substance and in part: (a) LOPEZ questioned the UC as to the number of individuals that would be in the Stash House and the surrounding area, and the UC responded that the UC believed there would be two individuals; (b) LOPEZ questioned the UC, stating "now you say you don't give a fuck about these people?", and the UC responded in the affirmative; (c) LOPEZ stated "even if it comes down to, they have to go out, they have to go down?", and the UC again answered in the affirmative; (d) LOPEZ advised the UC "I'd rather take them out, I honestly rather take them out then go through that hassle"; (e) the UC explained that he usually collects one to two kilograms and observes 10 to 12 kilograms in the Stash House; (f) the UC advised LOPEZ that the UC was due to

5

conduct the next collection on December 16, 2014, and further advised LOPEZ that the UC would be told on December 15, 2014, about the location where the UC was to wait; (g) the UC assured LOPEZ that the cocaine would be present in the Stash House; (h) LOPEZ stated that he had an additional individual who would assist him in the robbery; and (i) the UC requested to meet with LOPEZ and his associate the following day, December 10, 2014, and LOPEZ agreed.

        14.  On or about December 10, 2014, the UC met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," and LUIS GUERRERO, a/k/a "Weegi," the defendants, at a location in the Bronx; the meeting was recorded and surveilled by agents.[3] Based on my review of a report prepared by the UC following his review of the audio recording, I learned the following, in sum and substance and in part: (a) LOPEZ questioned the UC regarding whether the plan was still the same, and the UC responded that the only change was that the UC would be conducting the collection on December 17, 2014, in the area of Yonkers, New York; (b) GUERRERO questioned the UC as to the size and demeanor of the occupants of the Stash House; (c) the UC described the individuals, and further advised that one of the individuals would be armed with a gun, and that the other individual also might have a gun; (d) GUERRERO stated "I'm just worrying about getting in the crib, what happens in the crib, happens in the crib, I just want to get in the crib"; (e) the UC explained to LOPEZ and GUERRERO that the UC usually collects one to two kilograms of cocaine and, while waiting to perform the collection, the UC usually observes an additional 10 to 12 kilograms of cocaine in the living room of the Stash House; (f) LOPEZ questioned the UC, stating "that's for sure?" in response to which the UC assured LOPEZ that the cocaine would be present in the Stash House; (g) the UC confirmed with LOPEZ and GUERRERO that the UC would get half of the proceeds, and that LOPEZ and GUERRERO would split the other half; (h) LOPEZ stated that LOPEZ would discuss with the UC how the robbery would be executed, at a later date; and (i) the UC arranged to meet with LOPEZ and GUERRERO again on December 15, 2014.

---

[3] The UC is familiar with GUERRERO's voice based on several meetings with GUERRERO, described in this Complaint. I am also familiar with GUERRERO's voice, based on my review of the audio recordings described in this Complaint and based on my conversations with the UC. In addition, I reviewed a video recording of GUERRERO speaking during the meeting of December 10, 2014.

6

15.  On or about December 15, 2014, the UC met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," and LUIS GUERRERO, a/k/a "Weegi," the defendants, at a location in the Bronx; the meeting was recorded and surveilled by agents.  Based on my review of a report prepared by the UC following his review of the audio recording, I learned the following, in sum and substance and in part: (a) the UC questioned LOPEZ and GUERRERO as to the manner in which they intended to execute the robbery; (b) LOPEZ and GUERRERO advised the UC that they did not know precisely how the robbery would be conducted until they arrived and observed the Stash House; (c) regarding any occupants of the Stash House, GUERRERO stated, "yeah, cause I trying to say, probably like we all in the crib and nothing, and we have to leave them, feel me, and then, we'll probably have to leave them and I don't want other people coming looking for you"; (d) the UC advised that if LOPEZ and GUERRERO murdered the occupants, no one would know who was at the house at the time of the robbery, to which LOPEZ replied, "that's what I'm saying, no loose ends as far as that goes."; (e) the UC advised LOPEZ and GUERRERO that the collection had been changed again to December 18, 2014; (f) the UC further advised LOPEZ and GUERRERO that the UC was told to wait at the intersection of Yonkers Avenue and Walnut Street in Yonkers on the day of the collection, and that the UC expected a call at approximately 1:30 PM; (g) both LOPEZ and GUERRERO advised the UC that they would meet with the UC earlier than the anticipated call on the day of the collection; (h) LOPEZ and GUERRERO discussed the use of two cars for the purpose of committing the robbery; and (i) GUERRERO questioned the UC regarding whether the UC could set up future robberies, to which the UC responded "let's see how this goes".

16.  On or about December 16, 2014, at the direction of law enforcement, CS-1 met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, at a location in Manhattan; the meeting was recorded and surveilled by agents.  Based on my review of the audio recording, I learned the following, in sum and substance and in part: (a) LOPEZ informed CS-1 that LOPEZ was deciding between two individuals to serve as a driver if "shit [went] bad"; (b) LOPEZ asked CS-1 to Google the address provided by the UC so that LOPEZ could look at the surrounding area; (d) LOPEZ stated that he thought the robbery seemed well planned, but also pointed out where he thought police would be parked, in case "shit [went] nasty"; (e) LOPEZ stated that, during the robbery, they needed "to subdue these niggas," and that "the hardest part [would] be getting out"; (f) LOPEZ further stated that "we can't leave these niggas alive," and that "they have to go out right there"; (g) LOPEZ stated that he

7

had "a hammer on the ready"; (h) LOPEZ stated that he was concerned that the UC would not be the first courier to make a drug pick up, and that the number of "keys" at the Stash House might therefore be smaller than the UC had reported seeing in the past; and (i) LOPEZ and CS-1 further discussed the street value for the "keys," in an effort to work out pricing when it came time to sell the proceeds.[4]

       17. On or about December 18, 2014, at the direction of law enforcement, CS-1 met with GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, at a location in the Bronx; the meeting was recorded and surveilled by agents. Based on my review of the audio recording, I learned the following, in sum and substance and in part: (a) CS-1 asked LOPEZ if LOPEZ had found a driver, and LOPEZ responded in the affirmative; (b) CS-1 asked LOPEZ if LOPEZ knew the Yonkers area, to which LOPEZ responded that he did not, but that the driver did.

       18. Following the meeting between CS-1 and GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, CS-1 and LOPEZ walked to another location in the Bronx to meet together with LUIS GUERRERO, a/k/a "Weegi," the defendant; the meeting between CS-1, LOPEZ, and GUERRERO was recorded. Based on my review of the audio recording, I learned in sum and substance and in part that LOPEZ, GUERRERO, and CS-1 discussed using a van for the robbery. In addition, I am informed by CS-1 that LOPEZ, GUERRERO, and CS-1 together went to another location in the Bronx to obtain a nine millimeter handgun from an individual known to GUERRERO.

       19. Following the events described in the preceding paragraph, GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," and LUIS GUERRERO, a/k/a "Weegi," the defendants, and CS-1 were subsequently joined by a person later identified as JOSE RODRIGUEZ, a/k/a "D.R.," the defendant; their conversation was recorded.[5] Based on my review of the audio recording, I learned the following, in sum and substance and in part: (a) in a private conversation between CS-1 and GUERRERO, GUERRERO informed CS-1 that LOPEZ told GUERRERO that they were going to

---

[4] Based on my training and experience, my familiarity with the investigation, my debriefings of CS-1 and the UC, and my review of the audio recording, I believe that the term "hammer" refers to a firearm, and that the term "key" refers to a kilogram of cocaine.

[5] I am familiar with RODRIGUEZ's voice, based on my participation in a post-arrest interview of RODRIGUEZ.

8

have to "leave" the two individuals at the Stash House along with the UC; (b) LOPEZ discussed with GUERRERO, RODRIGUEZ, and CS-1 the fact that LOPEZ anticipated that two individuals would be present in the Stash House, one of whom was armed; (c) LOPEZ further stated that he expected there to be a total of 14 "birds," 12 in the Stash House and two to be carried out by the UC; (d) LOPEZ discussed the possibility of either robbing the Stash House itself, or simply robbing the UC of the two kilograms which the UC indicated the UC was to pick up from the Stash House; (e) RODRIGUEZ stated that he was "going there for all 12," and that he did not get involved for just "two birds"; and (f) LOPEZ and GUERRERO discussed the robbery plan with CS-1 and RODRIGUEZ - CS-1 was supposed to hang back, while the others rushed into the Stash House, subdued the individual with the gun, and seized the kilograms of cocaine.[6]

20.  GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," LUIS GUERRERO, a/k/a "Weegi," and JOSE RODRIGUEZ, a/k/a "D.R.," the defendants, and CS-1 subsequently entered a van (the "Van") driven by a person later identified as JOSE ORTIZ, a/k/a "Chico"; the conversation in the van was recorded. Based on my review of the audio recording, I learned the following, in sum and substance and in part: (a) RODRIGUEZ and CS-1 discussed the pricing of "birds" of coke and "dope" in ORTIZ's presence; (b) ORTIZ stated that he already had a "grip" on him;[7] (c) CS-1 noted that the crew members now had two guns between them; (d) CS-1 told the crew members that there were two individuals at the Stash House, one in the back with the "work" and one in the front with the gun; (e) as the Van approached the vicinity of Yonkers Avenue and Walnut Street in Yonkers, the crew members discussed what they believed to be a law enforcement presence in the area; and (f) an unidentified crew member remarked that even if the crew robbed "those guys," an apparent reference to law enforcement officials, "that's already a crime."[8]

---

[6] Based on my training and experience, my familiarity with the investigation, my debriefings of CS-1 and the UC, and my review of the audio recording, I believe that the term "bird" refers to a kilogram of cocaine, and that the term "leave" means to kill someone.

[7] I am informed by CS-1 that ORTIZ made this statement. Also, based on my familiarly with the voices of the other occupants of the Van, I was able to determine that ORTIZ was the speaker,

[8] Based on my training and experience, my familiarity with the investigation, my debriefings of CS-1 and the UC, and my review of the audio recording, I believe that the term "work" refers to drugs, and that the term "grip" refers to a gun.

9

21. I am informed by other ATF agents that a number of unmarked law enforcement vehicles were in fact parked in the vicinity of Yonkers Avenue and Walnut Street.

22. I am further informed by other ATF agents, who conducted surveillance of the Van, that the Van drove by the UC's location at Yonkers Avenue and Walnut Street several times, and ultimately departed the location and drove onto the Saw Mill River Parkway. I am further informed that ATF agents pursued the Van to the vicinity of Hunts Point Avenue and Lafayette Avenue in the Bronx, where agents stopped the Van. At the time of the traffic stop, JOSE ORTIZ, a/k/a "Chico," the defendant, was seated in the driver's seat, JOSE RODRIGUEZ, a/k/a "D.R.," the defendant, was seated in the front passenger seat, GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G," the defendant, was seated behind the driver, and LUIS GUERRERO, a/k/a "Weegi," was seated behind the front passenger. ATF agents placed all four defendants under arrest.

23. I am informed by a Task Force Officer with SPARTA ("TFO-1") that during a debriefing of CS-1 following the above-described arrests, CS-1 informed TFO-1 that the guns were in the front driver's side door panel.

24. I am informed by a Special Agent with the ATF ("Agent-1") that Agent-1 and other officers searched inside of the front driver's side door panel of the Van, and recovered two firearms, a Keltec P-11 nine millimeter semi-automatic pistol loaded with eight live rounds, and a Sentinel MK IV .22 caliber revolver loaded with seven live rounds.

25. I am informed by a second Special Agent with the ATF ("Agent-2"), that Keltec P-11 nine millimeter semi-automatic pistols and Sentinel MK IV .22 caliber revolvers are not and have never been manufactured in New York State.

26. I have reviewed criminal history records pertaining to JOSE ORTIZ, a/k/a "Chico," the defendant, which reflect that on or about October 6, 2005, ORTIZ was convicted in New York State Supreme Court, Bronx County, of Robbery in the First Degree, a class B felony, in violation of New York Penal Law Section 160.15(3).

27. I have reviewed criminal history records pertaining to JOSE RODRIGUEZ, a/k/a "D.R.," the defendant, which reflect that on or about January 5, 2011, RODRIGUEZ was convicted in New York State Supreme Court, Bronx County, of

Criminal Sale of a Controlled Substance in the Third Degree, a class B felony, in violation of New York Penal Law Section 220.39(1).

WHEREFORE, the deponent respectfully requests that GIBRON LOPEZ, a/k/a "Gibbs," a/k/a "G", LUIS GUERRERO, a/k/a "Weegi," JOSE RODRIGUEZ, a/k/a "D.R.," and JOSE ORTIZ, a/k/a "Chico," the defendants, be imprisoned, or bailed, as the case may be.

---
AMANDA SCHWEINER
Task Force Officer
Bureau of Alcohol, Tobacco, Firearms, and Explosives

Sworn to before me this
19th day of December, 2014.

---
THE HONORABLE ANDREW J. PECK
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

11