ENERGIC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   UNITED STATES OF AMERICA,

 4               v.                          14 MJ 2848 (VSB)

 5   LUIS GUERRERO, JOSE RODRIGUEZ,

 6               Defendants.

 7   ------------------------------x

 8                                        New York, N.Y.
                                          December 23, 2014
 9                                        9:55 a.m.

10

11   Before:

12                   HON. VERNON S. BRODERICK,

13                                          District Judge

14                             APPEARANCES

15

16   PREET BHARARA,
          United States Attorney for the
17        Southern District of New York
     CHRISTOPHER DiMASE
18        Assistant United States Attorney

19   STEWART ORDEN
          Attorney for Defendant Guerrero
20
     JOSHUA LEWIS DRATEL
21        Attorney for Defendant Rodriguez

22   ALSO PRESENT:  Kieran Keenaghan, Detective, NYPD

23

24

25
```

ENERGIC

1          (Case called)

2          THE DEPUTY CLERK:  Counsel, please state your names

3   for the record.

4          MR. DiMASE:  Good morning, your Honor.  Christopher

5   DiMase for the government.  Also present with me at counsel

6   table is Detective Kieran Keenaghan of the New York City Police

7   Department.

8          THE COURT:  Good morning.

9          MR. DiMASE:  Apologies for being late this morning.

10          THE COURT:  That's okay.

11          MR. DRATEL:  Good morning, your Honor.  Joshua Dratel

12   for Jose Rodriguez.

13          THE COURT:  Good morning.

14          MR. DiMASE:  Good morning.  Stewart Orden on behalf of

15   Mr. Luis Guerrero.

16          THE COURT:  Good morning.  You may sit down.

17          We are here on the bail appeal for the defendants.  I

18   have the pretrial services report.  I have the government's

19   letter, which attached a copy of the complaint.

20          Is there anything else that I should have?

21          MR. DiMASE:  Nothing from the government, your Honor.

22          THE COURT:  Okay.  Anything from the defense?

23          MR. ORDEN:  No, your Honor.

24          THE COURT:  Yes?

25          MR. DRATEL:  I don't know if you want to hear argument

ENERGIC

 1    or you mean that in terms of written --

 2            THE COURT:  Just in terms of written material.  No,

 3    no, obviously, yes, I would like to hear argument.  It's the

 4    government's appeal, so I'll hear from the government first.

 5            MR. DiMASE:  Yes, your Honor.

 6            I'll presume the Court has some familiarity with the

 7    complaint.

 8            THE COURT:  Yes, I've read the complaint.

 9            MR. DiMASE:  Great.

10            As the Court knows, the magistrate judge, Judge Peck,

11    set bail conditions for both of these two defendants, which was

12    in the amount of a $250,000 bond, with a $25,000 cash security.

13    It's not clear that the defendants are going to make that bond

14    in any event, but the government does believe that, based on

15    both risk of flight and danger to the community, detention is

16    appropriate here.  There is really no set of bail conditions,

17    not even the ones set by Judge Peck, that would reasonably

18    assure these two defendants' appearance in court and the safety

19    to the community.

20            So let me start by just talking about the case in

21    general because I think it goes especially to the danger to the

22    community element.

23            Obviously, both of these defendants were involved in a

24    plan to commit a violent robbery.  They appeared at a location

25    where they believed they were to commit that robbery with

ENERGIC

1  loaded guns.  I'm sure the Court is familiar --

2          THE COURT:  Mr. DiMase, a quick question, because I

3  noticed this in the complaint, was that supposed to be the

4  actual day of the robbery?

5          MR. DiMASE:  Yes, exactly.

6          THE COURT:  Do you know or do you have an

7  understanding of exactly -- because they drove by a couple of

8  times and then they left the scene and got on the highway.

9          MR. DiMASE:  Right.

10          THE COURT:  Do you have an understanding of what

11  happened?

12          MR. DiMASE:  Yes, we do, your Honor, because we had a

13  recording device in the car and we could hear what they were

14  saying.  And essentially they believed that a number of cars

15  that were parked in the vicinity of where they were to meet the

16  undercover officer were in fact police cars and lo and behold

17  they were in fact police cars, they were unmarked police

18  vehicles.

19          THE COURT:  Even unmarked police vehicles -- I can

20  understand that, sometimes they just -- and they might have

21  been nervous also but, okay, so they detected the surveillance.

22  I'm sorry.

23          MR. DiMASE:  They actually discussed that on the

24  recording, saying, hey, those look like police cars.  This is

25  not in the complaint.

1          In fact, it bears noting that the complaint is really

2     just a slice of these conversations; the conversations went on

3     for hours on the day of the robbery and even the prerobbery

4     planning meetings.  These are just the highlights, so to speak,

5     of the meetings.

6          But there were actually two members of the crew that

7     got out of the car at some point and attempted to conduct

8     surveillance on foot of the UC's location before they

9     ultimately decided to take off and get on the highway and

10     leave.  So this was not a ten-second drive by, see some police

11     cars and take off; this was passing by a couple of times in the

12     car, attempt some physical surveillance by foot because they

13     were concerned about the law enforcement presence, and then a

14     decision, look, there are probably cops here, let's get out of

15     here, this is not safe, we're going to get in trouble.

16          THE COURT:  Okay.

17          MR. DiMASE:  And as the complaint notes, one of the

18     individuals in the car -- I'm forgetting now which one it

19     was -- said, even what we've done now is already a crime.  They

20     recognized that even if these were law enforcement officers,

21     they were conspiring with, that was the gist of the comment,

22     that they had already committed a crime.

23          In any event, I think it's very important, for safety

24     of the community purposes, that they brought two loaded guns

25     that were basically fully loaded, seven live rounds in one of

ENERGIC

1    these guns, eight live rounds in the other, one was a

2    semiautomatic 9 millimeter pistol, another was a revolver that

3    was nearly fully loaded.

4           So not only did they discuss the possibility of

5    killing people in the course of this robbery, and that pertains

6    specifically to Mr. Guerrero, who was present at several

7    meetings before the fact with Mr. Lopez, who's not here today,

8    wherein they discuss not only committing the robbery but

9    killing the undercover and the individuals inside of the stash

10   house in order to leave no trace of their commission of the

11   robbery, not only did they discuss that, but they brought along

12   fully loaded guns with the capability to actually commit that

13   kind of crime and they were apparently prepared to do that.  So

14   that alone, I think, is sufficient for both of these defendants

15   to be detained on the basis of risk of danger to the community.

16          There is a lot of other background here involving

17   their criminal history, so I am going to address each one of

18   them individually as far as risk of flight and additional

19   issues regarding danger to the community.

20          Mr. Guerrero does have a prior bench warrant, as the

21   pretrial services report notes, he is unemployed.  The case is

22   particularly strong against Mr. Guerrero, and I think that goes

23   to risk of flight here.  He is present for numerous prerobbery

24   planning meetings where he's discussing, on an audio recording

25   with Mr. Lopez, the possibility of committing this robbery and

ENERGIC

1   killing people in the course of the robbery.  He is not only on

2   audio recordings, I don't think this is noted in the complaint,

3   it may be in a footnote, but he's also on video recordings

4   during these meetings.  These meetings are also surveilled by

5   law enforcement agents.  So he's at these meetings, he's making

6   the statements that are in the complaint.  And if this case

7   ever goes to a jury, he knows that the jury is going to be

8   seeing video and audio and hearing from agents about his

9   participation in these meetings.  So the strength of the case,

10  I think, is an enormous factor in terms of risk of flight.

11          And then with respect to danger, obviously the mere

12  fact of showing up to commit this robbery with loaded guns is a

13  huge red flag, but I think it bears noting, too, that

14  Mr. Guerrero has already a prior robbery conviction.  He was

15  adjudicated actually as a juvenile delinquent, so it's really

16  more of an adjudication, but on charges of a robbery in the

17  second degree aided by another and robbery in the second

18  degree, injury to the victim.  So this was clearly, based on

19  the charges alone, a robbery involving at least one other

20  person where the victim did in fact suffer physical injury.

21          He also had several other disorderly conduct

22  convictions, which I don't think are all that significant

23  except that they show this is somebody who has been through the

24  system repeatedly, he didn't stop committing crimes after his

25  robbery adjudication, he continued committing crimes, sustained

ENERGIC

1    two disorderly conduct convictions, then he shows up for this

2    violent robbery on the date in question.

3          So on the ground of both risk of flight and danger to

4    the community, the government submits that it's appropriate to

5    detain going.

6          Moving on to -- unless the Court has questions?

7          THE COURT:  I do, actually.

8          With regard to the robbery conviction when he was 14,

9    do you have an understanding what the underlying facts were in

10   connection with that cases?

11         MR. DiMASE:  Your Honor, I haven't been able to get

12   that yet.  It's a sealed adjudication; in fact, it doesn't show

13   up.  I don't believe it even shows up on my version of his

14   criminal history.  Let me take a look here.

15         Actually, it does.  And all I know, from reviewing the

16   criminal history, is that he was adjudicated on charges of

17   robbery in the second degree, aided by another, robbery in the

18   second degree, causing physical injury, and also grand larceny

19   in the fourth degree, taking property from the person of

20   another.

21         And I actually have some experience with state charges

22   since I used to practice in state court.  And the elements of

23   those crimes involve committing a robbery of another person

24   with a second individual and also causing physical injury to

25   the victim.  I don't have further information beyond that.

ENERGIC

1          THE COURT:  Okay.

2          You can go on to Mr. Rodriguez.

3          MR. DiMASE:  Thank you.

4          So with respect to Mr. Rodriguez, and I will start

5    with risk of flight, I'm not going to stand here and say the

6    case is as strong against Mr. Rodriguez as it is against

7    Mr. Guerrero.  Clearly Mr. Guerrero is involved in these

8    additional meetings that are video and audio recorded, but I

9    expect that Mr. Dratel is going to get up and claim that the

10   case against Mr. Rodriguez is weak, and I think that's

11   completely incorrect.

12         He is on an audio recording in the van discussing the

13   robbery with the other individuals present in the van.  He's in

14   the van when other individuals in the van are making statements

15   about the presence of guns in the van.  So he clearly knows

16   that there are firearms present in the van, whether he actually

17   ever had one in his hand or not.

18         I think the import of all that is, he understood what

19   he was doing that day.  Even if he hadn't participated in the

20   meetings prior to the day of the robbery, when he was in that

21   car, he understood the purpose of going to this location was to

22   commit a robbery and to steal drugs at gunpoint.

23         And I can actually give the Court just a little flavor

24   for that, that I think goes beyond what's in the complaint.

25   While they're in the car, Lopez is talking about various

ENERGIC

1   different options for committing the robbery.  He talks about

2   three different options, A, B or C.  One is to just take the 12

3   birds quote-unquote that are in the house, another is to just

4   basically highjack the undercover and take the two birds that

5   he has, and the third option is to get all 14, to go in the

6   house and get the 12 and to get the two from the undercover.

7        And he says, they got 14 birds, two guys in the house,

8   one hammer.  And he says, if I was them, I'd even go so far as

9   to put someone on the street in a car laid up in case something

10  goes wrong.  So they're anticipating the possibility of another

11  individual, beyond the two present, to provide security.

12       Guerrero says, that's why you have to weigh the risk

13  factor.  And he says burn them for the two; in other words,

14  let's go after the undercover and just get the two from him,

15  less risk, we get out of there.

16       And Rodriguez basically says that, I'm going over

17  there for all 12, I didn't come here for just the two.  And

18  that's all in the context of a conversation about how this

19  robbery is going to go down.  And it shows that he is

20  integrally involved, that he understands what's going to happen

21  and the purpose of their traveling to the location that day.

22       At some point later in the same conversation that's

23  taped in the van, Mr. Rodriguez is discussing with the

24  confidential source the pricing of kilos of crack and also of

25  heroin, so, again, evidence that he fully understood the

ENERGIC

 1    purpose of this whole enterprise was to rob this stash house of

 2    drugs.

 3              So while the case may not be as strong as it is

 4    against Mr. Guerrero, I still think that there is clearly a

 5    risk of danger to the community here.  Mr. Rodriguez understood

 6    what he was signing up for.  He was going to commit an armed

 7    robbery of drug dealer and they had two loaded guns in the car,

 8    just the same as Mr. Guerrero.

 9              Moreover, Mr. Rodriguez has a more significant

10    criminal history, which I think has to be factored in.  He has

11    a prior felony conviction for drug sale, for which he received

12    a sentence of two years.  He violated probation after he was

13    released on that sentence.  For that reason, because he does

14    have a prior felony conviction, Mr. Rodriguez is charged with a

15    felon in possession of a firearm count in addition to the

16    robbery and 924(c) counts.

17              And I would argue that even to the extent that a jury

18    was not to convict Mr. Rodriguez based on these very clear

19    audio recordings, they could still easily convict him of a

20    922(g), for being present in that car with two loaded firearms,

21    having previously sustained a felony conviction.

22              That's not to say the proof is weak; I think I've made

23    the argument already, the proof against him is very strong,

24    he's got two prior bench warrants, one is from 2014 though it

25    is for failing to pay, he appears to have a 2010 bench warrant,

ENERGIC

1   though, for failure to appear.  As I said, he has a revocation

2   of probation.  That didn't stop him from coming back to commit

3   this crime, among others.  He's got several prior misdemeanor

4   convictions as well, and he's also got the previous arrest by

5   the federal government.  I say that only to note the fact that

6   he has previous experience with the federal law enforcement

7   process.

8           Now, that case was dismissed, and I don't think the

9   Court ought to consider any facts underlying that arrest

10  because it doesn't appear that the government could proceed in

11  that case, but I do think that it shows that Mr. Rodriguez,

12  who's been convicted in the state of a felony and multiple

13  misdemeanors, who's also been picked up by the federal

14  authorities before, that didn't deter him.  That's really the

15  argument I'm trying to make.  He still goes ahead and commits a

16  federal robbery, he possesses a gun after he's been convicted

17  of a state felony conviction.

18          So, finally, your Honor, pretrial does recommend

19  detention with respect to Mr. Rodriguez.  And I think the

20  difference there between him and Mr. Guerrero has to do with

21  his criminal history and the fact that he's previously been

22  convicted of a felony.  I think there are strong reasons, for

23  both defendants, to hold them on danger to the community.  I

24  really don't think, given the facts of this case, there are any

25  conditions that will reasonably ensure the safety of the

ENERGIC

1    community.

2           And for risk of flight, the case against Mr. Guerrero

3    is incredibly strong.  That bears on risk of flight for him.

4    And as for Mr. Rodriguez, while the case isn't quite as strong,

5    he has a significant criminal history, I think, that has to be

6    considered in determining his likelihood of fleeing and not

7    returning to court on these charges.

8           If the Court has any other questions, I'm happy --

9           THE COURT:  Just one right now.

10           MR. DiMASE:  Yes, your Honor.

11           THE COURT:  In reading the complaint, I didn't see

12    this:  Do you know if there were any discussions from any of

13    the defendants about prior robberies, prior history,

14    conversations of perhaps other robberies that they may have

15    been involved in?

16           MR. DiMASE:  May I have a moment to speak with the

17    agent, your Honor?

18           THE COURT:  Sure, yes.

19           MR. DiMASE:  Thank you.

20           (Pause)

21           MR. DiMASE:  Judge, Mr. Lopez, who's not here today,

22    does discuss prior burglaries and other crimes that he

23    committed in the course of the conversations with the CS.  I'm

24    trying to locate it here in the reports.  There is also a

25    conversation at some point where either Lopez or Guerrero, I'm

ENERGIC

1  not sure which -- and this is again in one of the meetings

2  prior to the day of the planned robbery -- discusses with the

3  undercover the possibility of setting up future robberies if

4  this one --

5          THE COURT:  I did see that as well.

6          MR. DiMASE:  That's in the complaint.

7          THE COURT:  Okay.

8          MR. DiMASE:  I know that occurred.  And there are

9  other conversations where Lopez talks about how he's had a

10  robbery gone bad before, where bad things happened to the

11  people inside, and other conversations where he is discussing

12  the previous burglaries and other crimes he's committed.

13          Aside from that, I don't know of any recorded

14  statements where other members of the group that were in the

15  car talk about prior crimes they have committed.

16          THE COURT:  Okay.  Obviously, if you don't intend to,

17  it's perfectly fine to say that.  Do you have a sense of

18  timing, in other words, how long -- do you anticipate indicting

19  shortly or not?

20          MR. DiMASE:  We definitely intend to move forward with

21  these cases against all four defendants as felonies.  Whether

22  that means indicting or if one or more of them agree to the

23  filing of an information, but to the extent that they are not

24  rolling the charges over, yes, we absolutely intend to proceed

25  to the grand jury in this case.

ENERGIC

1          THE COURT:  Just the rationale for me asking was

2     simply, obviously there's going to be another district court

3     judge who has this, and he or she may have a different sense of

4     whether or not the defendants should be bailed or not.  And so

5     I was just wondering if it was going to be short, I might let

6     that district court judge make that decision himself or herself

7     since the defendants have not met the conditions, but we will

8     go forward today and we'll resolve it.

9          MR. DiMASE:  One of the four defendants, who's not

10    here, Mr. Ortiz, he consented to detention, and he actually did

11    not wait till the 30th day.  But I can't say that within the

12    next 14 days he might not decide to do that, so I can't say

13    exactly how long it will be before we move to the grand jury

14    presentation of the case.

15          THE COURT:  Sure.

16          Mr. Orden, Mr. Dratel?

17          MR. ORDEN:  I may just need a moment.

18          THE COURT:  Sure.

19          MR. ORDEN:  I don't have his RAP sheet.  That may at

20    least be helpful.

21          THE COURT:  Sure.

22          MR. ORDEN:  Just give me one second?

23          THE COURT:  Sure, why don't you take the time to look

24    at the reports.

25          MR. DiMASE:  Actually, Judge, there is one more very

ENERGIC

1   small point.

2           THE COURT:  Sure.

3           MR. DiMASE:  Because I imagine Mr. Dratel in

4   particular may try to cast some doubt on who was talking in the

5   conversation in the van when these statements that we're

6   attributing to Mr. Rodriguez were made.  Beyond the fact, as

7   it's pointed out in the complaint, that the agents did speak to

8   Mr. Rodriguez after he was arrested and therefore heard his

9   voice and had some opportunity to compare it to the voices in

10  the car, in his postarrest statement Mr. Rodriguez talked about

11  working on a degree for taxes, for preparing taxes; and

12  actually in the van, when he is talking with the other folks in

13  the van, one thing that he says is that he's going to be

14  preparing taxes for crackheads.

15          Actually, one moment?

16          (Pause)

17          MR. DiMASE:  I'm sorry, apparently that particular

18  comment was made in the residence before they got in the

19  vehicle, but nonetheless connecting that comment, the fact that

20  he was going to be preparing taxes for crackheads, to the

21  comment that he makes in the precinct after he's arrested, they

22  can tell who Mr. Rodriguez is in the course of the

23  conversations that are recorded.

24          I just wanted to make that clear.  It's not merely

25  voice recognition, there's also something about what he says in

ENERGIC

1   these conversations that connects to Mr. Rodriguez

2   specifically.

3            THE COURT:  Okay.

4            MR. ORDEN:  I'm ready, Judge.

5            THE COURT:  Okay, why don't you proceed.

6            MR. ORDEN:  And it was helpful.

7            THE COURT:  Okay.

8            MR. ORDEN:  Well, first I would note that if the bare

9   facts of the complaint were satisfactory to hold my client

10  without any bail conditions, it would seem to me for every case

11  of this sort there would be the end of the discussion, no

12  client would ever get bail.  And it seems to me my client is,

13  at least with regard to his record and life and history, one of

14  the people on the low end of the scale, who in a case like this

15  should get released, as pretrial recognized and recommended.

16  They recommended a bond on two signatures.  I offered up five

17  signatures.

18            So let's talk about some of the issues here.  One is

19  Mr. DiMase addressed risk of flight, the nature of the charges

20  is serious.  My client has his entire life history living in

21  the Bronx.  He has lived there his entire life, he lives with

22  his mother.  Every contact he has in life, in terms of familial

23  relations and friends, are in the Bronx.

24            He can turn in his passport, but with regard to risk

25  of flight, he is not a person who, on the facts before this

ENERGIC

1  Court, it would seem to me, would be a high risk in terms of

2  that possibility.

3          And one of the things Mr. DiMase raised was that he

4  has a bench warrant.  He didn't stress it but he mentioned it,

5  and I know the Court is always concerned with regard to that.

6  And I actually have some experience in the system as well as

7  Mr. DiMase does.  So --

8          THE COURT:  With the system?

9          MR. ORDEN:  It the state system.  Well, I've been in

10  in a different way.

11          THE COURT:  Yes, yes.

12          MR. ORDEN:  Thanks, Judge, for clarifying the record

13  for me.

14          So let's talk about this bench warrant issue.  This

15  sheet actually does clarify exactly what I suspected it to be,

16  because it would be rare that, looking at the dates of his

17  original arrest and his voluntary return on a warrant where he

18  pleaded guilty to a violation, that there would be some sort of

19  affirmative or active neglect on my client's part to return to

20  court.

21          And I think the issue is resolved, as it almost always

22  is, in my experience, that in this case back in 2008, in

23  between the time of my client's arrest and the time that he

24  pleaded guilty to a violation, the courts switched on him in

25  the Bronx and he was assigned different numbers.  And there was

ENERGIC

1   an appearance originally in criminal court, it was later in

2   Supreme Court.  And my experience has been, unfortunately, with

3   the communications, not to disparage state criminal defense

4   lawyers because they are a wonderful lot to a great extent, but

5   it is common that the contact between lawyers and their clients

6   in the state system -- because I see this virtually always,

7   there's a bench warrant when there's a switch in courts -- that

8   they're not advised of that change and they miss a court date.

9          And I can tell you that there are at least three

10   docket numbers assigned to my client, two of which are criminal

11   court docket numbers where he made an original appearance and

12   the latter being the Supreme Court docket number or actually,

13   while not indicted, I suppose it would be called an indictment

14   number up there or a felony number, where he in fact returns on

15   January 13th, 2009, to plead guilty.

16          So without knowing more and observing the file,

17   Judge -- and I don't know that Mr. DiMase would disagree with

18   this too much -- that's what seems to have happened here.

19   Through someone's negligence or miscommunication, he misses a

20   date in court in December, learns of it and voluntarily returns

21   on the 13th of January 2009, my birthday as a matter of fact,

22   to plead guilty from what was originally charged as a B felony,

23   pleaded down to a violation, a noncriminal charge, which also

24   begs the question of how legitimate that original charge was.

25   While in the state system, it's certainly not unusual for

ENERGIC

1    defendants to be given the opportunity to plead guilty to

2    lesser counts than which they were charged with as part of a

3    plea bargain deal that goes on all the time in state court, to

4    be arrested for a B felony, which carries with it many, many,

5    many years in jail in the state system, down to a violation,

6    quite frankly, supports what I would posit is the lack of a

7    real case against my client in any substantive way, that he

8    actually committed that crime of a B felony.  You don't get a

9    violation of disorderly conduct in any state court off a B

10   felony sale.

11          Now, Mr. DiMase addressed the fact that my client had

12   been convicted previously -- not convicted, adjudicated -- of a

13   robbery while he was 14 years old.  That is the only serious, I

14   would submit to the Court, allegation in my client's life prior

15   to the instant case.  That was half a lifetime ago for my

16   client.  And that was a school fight.  Obviously, in that

17   school fight, it's between many people, something got taken,

18   and those are the facts of the case, and I think they'd be

19   revealed when Mr. DiMase obtains the records, if he needs to in

20   the future.

21          But certainly, again, even if that was in fact a

22   school fight where something was taken, when you're 14 years

23   old, if you're represented in state court and you're ordered an

24   adjudication of a youthful offender, for which you are told you

25   will never have a criminal conviction and the records are

ENERGIC

1   sealed, you take it.

2          I'm not saying he didn't involve himself in a fight;

3   I'm talking about the mere allegations in the disposition here

4   may not accurately reflect the seriousness with which

5   Mr. DiMase submitted to the Court happened.  A robbery in state

6   court can be as little -- and I'm not minimizing in terms of

7   you're not committing a crime, but can be as little as

8   knee-grabbing a woman's chain off her neck, pulling it off with

9   force, that's a robbery, as is me coming up to the same woman

10  with a gun, sticking it in her face and saying, I'll kill you

11  and take the -- they're both robberies.

12         So that happened 14 years ago -- I'm sorry, 12 years

13  ago, I believe.  It is the only serious charge with any bite to

14  it that my client has ever been charged with.  And we now come

15  to today's events.  And the plain facts, as written in the

16  complaint, they're serious, I don't deny that.  But something

17  else is here, in terms of what really was going on, what my

18  client really agreed to do, what those tapes will reveal in the

19  future in terms of whether he engaged in legitimate discussions

20  where he actually believed he was going to engage in a crime of

21  violence and perhaps -- by the way, there's no specific

22  statement in the complaint about him murdering anybody, but

23  they've alleged that's perhaps what his statements meant.  I

24  don't know what those statements in the complaint alleged to be

25  by me mean, meaning we'll leave them, maybe meaning we're going

ENERGIC

1    to leave them alive.

2              But from the time he's 14 to when he's 26, he doesn't

3    engage in any crimes of violence, he's not robbing anybody,

4    he's living a law-abiding life other than two minor

5    infractions, he's in love, he has a companion, and all of a

6    sudden he gets involved in what are very serious charges.  This

7    is not an habitual violent street-running, gang member,

8    robbery-committing person.

9              So I think, given all that history -- by the way, with

10   respect to any of the Lopez conversations about prior

11   robberies, I don't think in any way, from what I have seen,

12   they can be attributable to my client or his codefendant here.

13   I know nothing -- and of course I haven't heard the recordings,

14   Mr. Lopez can say whatever he wants and there are many

15   occasions where he's meeting individually with the undercover

16   without these guys.  There's no mention, that I know of, that

17   my client is there, he's participating in it or acknowledging,

18   or even acknowledging, that he's ever committed something like

19   this before.

20             So, given all that, is there a set of conditions that

21   will guarantee my client's return to court and the safety of

22   the community?  And I think the magistrate got it right.  He's

23   not working but he only hasn't been working for two months.

24   It's not as if my client -- and, by the way, everything he said

25   in the pretrial services report, as I noted at the presentment

ENERGIC

1  to the magistrate, is confirmed by his girlfriend, who was in

2  court all day, which is why she could not corroborate through a

3  telephone call or anything through pretrial, she was in court

4  all day, as were friends and family.  She's here today to

5  reiterate that she can corroborate everything my client said.

6          But the question is, are there -- I think the

7  magistrate got it right.  He's not fleeing anywhere but he can

8  be placed under house arrest, with electronic monitoring, where

9  his family and friends put up $25,000 in cash, which, if they

10  can do it, would be an enormous amount for these people to do

11  in their circumstances, but if they can raise the funds -- in

12  fact, if they can raise the funds in that way, I would suggest

13  to the Court it only enhances what I'm talking about with

14  respect to my client in terms of the type of person he is and

15  the support that they are willing to provide in terms of

16  putting such a significant amount of money up on his behalf as

17  well as the risks, since they're all working, all of the people

18  who would sign are going to be employed people, not only

19  putting $25,000 in cash up but risking a quarter of a million

20  dollars is a huge responsibility and they have to think and

21  look into their hearts to do something like this and they're

22  prepared to do it.  I don't know that that will be done.

23          I also don't know the costs of electronic monitoring,

24  which, frankly, except in the case of hugely wealthy people,

25  I've never heard of it being imposed on an individual in this

ENERGIC

 1    courthouse before, but so be it, it was, I think that's over

 2    the top.

 3            But house arrest, electronic monitoring, surrenders

 4    his passport, five people, five cosigners, all employed with

 5    $25,000 cash, your Honor, I would suggest that in this case,

 6    with my client, that should alleviate the concerns,

 7    obviously -- I'm sure the Court always has concerns when they

 8    allow somebody to be released, but alleviate the concerns of

 9    the Court to the extent that it does not reverse the

10    magistrate's order in this case.

11            THE COURT:  Just a quick question, actually it's

12    probably more for the government:  I'm trying to figure out, I

13    know that Mr. Ortiz was the driver, I understand.  Do you have

14    an understanding of whose van it was?

15            MR. DiMASE:  May I have one moment, your Honor?

16            THE COURT:  Sure.

17            (Pause)

18            MR. DiMASE:  Your Honor, I'll answer that question.  I

19    just have one minor point to raise about what Mr. Orden said,

20    nothing too significant, but, yes, we did determine -- well,

21    Mr. Ortiz indicated the car was his girlfriend's van, and he

22    provided the name of his girlfriend, and DMV checks run on the

23    license plate did in fact come to Ortiz's girlfriend.  So it

24    appears to be a van owned by his girlfriend.

25            THE COURT:  Okay.

ENERGIC

1        MR. DiMASE:  Just one minor point:  At the end of

2   paragraph 15 on page 7, (i), I think the Court noted that it

3   had read this and sort of understood its import here, but while

4   Mr. Guerrero may not have talked about prior crimes, he was

5   asking the undercover about setting up future robberies if this

6   one went well.

7        THE COURT:  And just briefly on the van, the firearms,

8   were they secreted, in other words, you had to pull the

9   covering of the door and then the guns were slid in there and

10   then the covering put back up?

11        MR. DiMASE:  That's right, your Honor.  At some point

12   the guns were out in the van and at some point someone in the

13   van, I think it might have been the CS, indicates now we have

14   two guns in front of everyone there.  But the CS is the one

15   that tells the ATF agents they put the guns inside that panel

16   of the door, and they had to actually open up the panel and

17   take the guns out, that's correct.

18        THE COURT:  Okay.

19        Mr. Dratel?

20        MR. DRATEL:  Thank you, your Honor.  Just a threshold

21   issue:  These are somewhat onerous conditions to meet for

22   Mr. Rodriguez, so it's very strict bail, not in terms of the

23   behavioral conditions, which were fine, which we asked for, but

24   the economic ones, I don't know he will be able to meet it, and

25   their family, but they're trying.

ENERGIC

1          His family is not here today, as far as I can tell,

2     because there was some confusion with respect to the room

3     number where we were going to be.  Also, Mr. Rodriguez's mother

4     is on vacation.  She's an executive at a children's learning

5     center, I understand, but his brother, his half brother, and

6     his girlfriend were in court all day Friday, which is, again,

7     like Mr. Orden's situation, that he described for Mr. Guerrero,

8     why pretrial could not verify with her information, because the

9     girlfriend, Ebony Jaquez, was in court the entire day waiting.

10          So the family is very much involved in this.  And I

11    spoke to a family member last night, so I understand from

12    Mr. DiMase, someone may have shown up at the other courthouse

13    at the magistrate's, where we were on Friday, they may be on

14    their way here, they may get here by the time we're concluded.

15    But the point is, I don't want the Court to think that he's

16    without people who care about him, who are willing to --

17    certainly to sign, raising the 25,000, is really going to be

18    the issue.  I think Judge Peck said that either cash or

19    property, but either way it's a significant hurdle for

20    Mr. Rodriguez.

21          What I'm trying to say about that is that's a

22    significant issue with respect to, if that property is raised,

23    it's a significant moral suasion issue for Mr. Rodriguez.  It's

24    not a drop in the bucket, it's beyond the capacity generally of

25    the family.  So in that context, it's a significant

ENERGIC

1    disincentive for flight in that regard or for any kind of

2    noncompliance with bail.

3          In addition, the behavioral conditions, I think, more

4    than adequately address dangerousness issues.  And my

5    experience with electronic monitoring and house arrests and

6    strict reporting, those are very successful in maintaining

7    compliance with bail, in terms of both flight and

8    dangerousness.

9          With respect to the tapes, it's very difficult for us

10   to respond without access to them.  And I know that in other

11   situations, tapes like that have been made available in the

12   context of bail hearings, not only for the Court but also for

13   the defense.  It's impossible to argue against something for

14   which we don't have access and there is authority for the Court

15   to exercise its discretion to test the reliability and the

16   accuracy of the government's position.

17         I know with many of these contexts in tapes, tapes may

18   say one thing in one snippet but in a context they say very

19   different things, and there's a lot of things that are said

20   reportedly by people and we don't know who's listening, who's

21   not listening, who's engaged in doing something else, who may

22   be engaging in looking at their phone, who may be looking out

23   the window, who may be doing a variety of different things that

24   don't necessarily mean that someone is accountable for

25   everything someone else says, regardless of even whether they

ENERGIC

1   said it at all, in other words, things that are attributable to

2   them.

3          So in U.S. v. Martir which is 782 F.2d 1141,1145 and

4   1142 that's a Second Circuit case in 1986, the circuit

5   indicated that the Court has the authority to test the

6   reliability of this information.  And I know in other cases

7   courts have required the government to produce the specific

8   information that we're relying on here because it's a tape,

9   it's going to be produced in discovery anyway.

10         So the point is, an important decision like this,

11   critical decision in the context of this case, in any case, is

12   bail.  And to make that decision without the ability to have an

13   accurate determination of what the facts are, and really an

14   adversarial determination of what the facts are, I think is

15   unfair in that regard.

16         THE COURT:  Let me ask, the case you just cited, that

17   was the Second Circuit speaking in terms of the availability of

18   the tapes in the bail context?

19         MR. DRATEL:  Yes, it was bail.  So I think that should

20   be provided as well.

21         Now, with respect to the case itself, with respect to

22   what we do know -- when I say "we," I mean the defense -- what

23   we have in front of us is, Mr. Rodriguez is an extraordinarily

24   latecomer to this episode, he doesn't appear until paragraph 19

25   of the complaint, and it's really just he gets in the van and

ENERGIC

1    according to the plaintiff there's a little bit more discussion

2    and they're on their way.  There's no acknowledgment about

3    weapons in there.  Even if, as the government alleges, there's

4    an acknowledgment about drugs and the question is who says what

5    and what they mean is, again, framed by context, it's not

6    framed by necessarily a single sentence, even if it's said by

7    Mr. Rodriguez, which we don't necessarily concede without

8    access to the tape recordings, there's nothing about weapons.

9           Again, he didn't say anything about weapons.  The

10   prior conversations about robberies, not attributable to him.

11   Again, he's not present for it 95 percent of the time that this

12   is occurring.  So I do think it's a case that has -- it's a

13   case that has significant obstacles for the government, I

14   think, in terms of proving beyond a reasonable doubt that

15   Mr. Rodriguez is a conspirator in a robbery.  So I think that's

16   a factor, obviously, weighing on behalf of bail.

17          In addition, prior record:  Almost all marijuana,

18   except for the one case in which Mr. Rodriguez went to jail,

19   and I think Mr. DiMase misspoke, I don't think it was

20   intentional but I just think that the probation violation was

21   not in fact for the crime he -- it was not for what he went to

22   jail for, it's for YO, it's for a youthful offender conviction

23   back in 2007, he violated probation, and the violation was a

24   marijuana arrest.

25          So there are a series of marijuana arrests.  Then he

1    successfully completed his parole from the time that he was

2    incarcerated.  Then there are subsequent, again, marijuana

3    arrests.  The warrant on one of the marijuana arrests is

4    returned two days later and the other warrant is for a

5    nonpayment.

6            Also, I think it's very important that, in the context

7    of when the pretrial services report talks about numerous

8    arrests and convictions, that almost every one of them is

9    marijuana.  There is no violence at all, nothing with firearms,

10   nothing with violence in Mr. Rodriguez's history at all.  So I

11   think that's an important factor with respect to bail.

12           Also, with respect to appearance, this is a defendant

13   who, as the cases were more serious, actually was more

14   responsible; in other words, he reported for his sentence, he

15   did his time, he completed his parole successfully, he was

16   gainfully employed at that time.  So all of that is a factor, I

17   think, in terms of his ability or the confidence that the Court

18   can have that he will do this successfully as well regardless

19   of the outcome.

20           And, again, this is coupled with the imposition on the

21   cosigners and whoever can put up the cash or property, so

22   that's an important factor.

23           Also, the pretrial report:  I'm a little bit of a loss

24   to understand the pretrial report in the sense that some of the

25   factors that the pretrial report considers as factors not

ENERGIC

1    warranting bail, such as the fact that he's unemployed, which I

2    can't see how that can be a reason for denying bail or even a

3    significant factor.

4            No financial ties to the community:  This is someone

5    who was born and lives in the United States, so I don't know

6    what pretrial services is talking about other than it's just a

7    repetition of unemployed familial ties to the Dominican

8    Republic, ties to a family overseas and having a family --

9    again, as Mr. Orden said, not in this context but in a

10   different context, in terms of the seriousness of the offense,

11   the charges themselves, that would disqualify almost everyone

12   these days from bail.  He hasn't been to the Dominican Republic

13   since 2002.  His passport has expired.  The idea of flight on

14   that issue is purely fanciful, I don't understand it at all.

15           Daily use of marijuana:  Again, I don't think that's a

16   reason to put someone in jail.  That's a reason to put someone

17   in a program, that's not a reason to deny bail.  And we've

18   talked about the record, the warrants and the probation

19   revocation, which, again, goes back to 2008 on a YO.

20           So all of that, I think, demonstrates that Magistrate

21   Judge Peck who, again, looked at all this material, made a

22   rational eminently defensible and appropriate decision, in

23   granting bail, a difficult bail to meet but one that will

24   assure attendance and dispel danger to the community.

25           Thank you, your Honor.

1        THE COURT:  Thank you.

2        Mr. DiMase?

3        MR. DiMASE:  Just two very small points, one which I

4   entirely forgot to mention, and I think one of the elephants in

5   the room is these two defendants face a mandatory minimum

6   sentence of 15 years, if convicted of all counts after trial.

7   So, in combination, with the strength of the case, that's

8   really what leads to the serious concern about risk of flight

9   here -- strong case, significant mandatory minimum sentence,

10  ten years on the (b)(1)(A) conspiracy, five years on the 924(c)

11  firearms possession.  So I think that's another important fact.

12       And lastly, to Mr. Dratel's point about what's going

13  on in the car, we stand by our arguments about who said what in

14  the car.  But putting that aside, four people are in a car,

15  with two guns, to go to a robbery location.  They meet up

16  beforehand, they pass the undercover several times, they do

17  physical surveillance.  There's plenty of circumstantial

18  evidence, beyond just what's said in the car, to show that

19  these four gentlemen were there to do a robbery.

20       And I think it's a fair inference, when you're in a

21  van of close space like that, you're likely to hear what's

22  being said.  It's not like these people are in a crowded club

23  with lots of additional noise.

24       So I think there's plenty here to make this a strong

25  case, and obviously there's the significant mandatory minimum

1   as well.

2          THE COURT:  Okay.  Now, I appreciate the argument of

3   both parties, and perhaps if I was getting this ab initio or it

4   were my case, I may have come to a different conclusion.  I

5   will uphold the magistrate judge's decision.  Having said that,

6   I think that I also want the district court judge who has this

7   case to be able to review it.

8          So what I will say is, I do think it's an extremely

9   close case, extremely close case; and, therefore, as you start

10  producing the discovery -- and this is for both sides -- I

11  would say, if the tapes bear out much of what the government

12  has indicated and perhaps more, I think that would be reason to

13  revisit the issue in front of the district court judge who gets

14  the case.

15         Equally, to Mr. Dratel's point, if the tapes don't

16  bear it out, then, obviously, defense can make an application

17  also to the district court judge if they believe that the

18  conditions are too onerous.  But I will say this:  I do think

19  that although I do agree that the $25,000 is going to be

20  difficult for the defendants to actually meet that, I do think

21  that that factor, at least for me, is something that is

22  critical for the bail and a component of the bail, because that

23  would show that people are willing to go above and beyond for

24  Mr. Rodriguez and Mr. Guerrero.  And I understand it's a

25  significant thing for people to do, but for just that very

1    reason, I think that's why Magistrate Judge Peck imposed those

2    conditions.

3            So I am going to uphold Magistrate Judge Peck's order

4    but with my commentary, so that either party, should they

5    choose, once the case progresses, they can revisit the issue in

6    front of the district court judge who gets the case.

7            MR. DiMASE:  Judge, I should note, we do have copies

8    of that recording here today, to the extent the Court wishes to

9    review it.  I understand the Court's rulings today, but that is

10   something we are prepared to do.  And of course our concern is,

11   the horse may be out of the barn if these defendants are

12   released and then don't return, and it's too late then to go to

13   a district court judge to make these arguments again.  I'm just

14   saying, we do have them, we're willing to produce them to the

15   Court if that would be something the Court is interested in

16   reviewing.

17           THE COURT:  Mr. DiMase, what I would suggest is --

18   while, yes, I can review them, I think what would make sense is

19   that if there are tapes that you would intend to rely on or you

20   want to produce discovery in advance, at least the tapes, in

21   advance of the indictment, that's something -- because I

22   wouldn't just listen to the tapes without giving the

23   opportunity to the defense to also listen to the tapes.  So if

24   that's something you want to do, then that's the way I would

25   suggest moving forward.

ENERGIC

1          MR. DiMASE:  Judge, if we do that, we do produce

2    recordings to counsel, should we produce that to you or to --

3    if it's a Part 1 judge, let's a say it's after New Year's, for

4    example, should we go to that judge?

5          THE COURT:  If you want, since I've heard it, it would

6    go to the Part 1 judge who was on it.  The case is still in

7    front of the Magistrate's Court, but since I've reviewed case,

8    I would keep it, that's my discretion.  And I --

9          MR. DiMASE:  To the extent it's not indicted and

10   before --

11         THE COURT:  Correct, correct, I'm on Part 1 through

12   Sunday, so Sunday at midnight, although the Court won't be

13   open.

14         MR. DiMASE:  Understood, your Honor.  I'll discuss the

15   matter internally at our office to decide how we'd like to

16   proceed.  If we do determine it's appropriate to turn over the

17   recording, I'll make that available to the Court and the

18   parties, and we can have another hearing if that's necessary at

19   that point.

20         THE COURT:  All right.

21         Is there anything else from the government?

22         MR. DiMASE:  No, your Honor, nothing today.  Thank

23   you.

24         THE COURT:  From Mr. Orden?

25         MR. ORDEN:  No, your Honor.

ENERGIC

```
 1              THE COURT:  Mr. Dratel?
 2              MR. DRATEL:  No, your Honor.  Thank you.
 3              THE COURT:  Thank you very much for your arguments.
 4              MR. DRATEL:  Thank you.
 5              THE COURT:  We stand adjourned.
 6              MR. DiMASE:  Have a happy holiday.
 7              THE COURT:  Thank you.  You too.
 8                                  *  *  *
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```